## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SONOMA VALLEY HOSPITAL**
347 Andrieux Street
Sonoma, CA  95476

**ST. ROSE HOSPITAL**
27200 Calaroga Avenue
Hayward, CA  94545

**GLENDORA OAKS BEHAVIORAL
HEALTH HOSPITAL**
150 West Route 66
Glendora, CA  91740

**POMONA VALLEY HOSPITAL
MEDICAL CENTER**
1798 North Garey Avenue
Pomona, CA  91767

**METHODIST HOSPITAL OF SOUTHERN
CALIFORNIA**
(dba USC Arcadia Hospital)
300 West Huntington Drive
Arcadia, CA  91006

**LODI MEMORIAL HOSPITAL**
(dba Adventist Health Lodi Memorial)
975 South Fairmont Avenue
Lodi, CA  95240

**TORRANCE MEMORIAL MEDICAL CENTER**
3330 Lomita Boulevard
Torrance, CA  90505

**MARIN GENERAL HOSPITAL**
(dba MarinHealth Medical Center)
250 Bon Air Road
Greenbrae, CA  94904

**WEST ANAHEIM MEDICAL CENTER**
3033 West Orange Avenue
Anaheim, CA  92804

Case No.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

**THE QUEEN'S MEDICAL CENTER**
1301 Punchbowl Street
Honolulu, HI  96813

**DEACONESS MEDICAL CENTER**
(dba Multicare Deaconess Hospital)
800 West Fifth Avenue
Spokane, WA  99204

                    Plaintiffs

      v.

**ROBERT F. KENNEDY, JR**., In His
Official Capacity as Secretary, U.S.
Department of Health & Human Services
200 Independence Avenue, S.W.
Washington, D.C.  20201

                  Defendant.

---

## COMPLAINT FOR JUDICIAL REIVEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

This is a civil action brought to obtain judicial review of final decisions rendered on July 8, 2025, by the Provider Reimbursement Review Board ("PRRB"), acting as a component of the United States Department of Health and Human Services ("HHS"). The decisions for which judicial review is hereby sought are as follows:

- PRRB Case No. 14-0069G
- PRRB Case No. 13-3906G
- PRRB Case No. 13-3908G
- PRRB Case No. 14-0165G
- PRRB Case No. 14-3761G
- PRRB Case No. 14-3238G
- PRRB Case No. 15-2662G
- PRRB Case No. 16-0683G
- PRRB Case No. 17-1235G
- PRRB Case No. 19-1457G
- PRRB Case No. 22-0259G

## JURISDICTION AND VENUE

1.      This is a civil action arising under Title XVIII of the Social Security Act, as amended (42 U.S.C. §§ 1395 *et seq*.) (hereinafter referred to as the "Medicare Act" or the "Act"), to obtain judicial review of a final adverse agency decision of the Secretary of the United States Department of Health and Human Services.

2.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1361.

3.      Venue lies in this judicial district under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1391.

## PARTIES

4.      Plaintiff, SONOMA VALLEY HOSPITAL, (Medicare provider number ("MPN") 05-0090), is an inpatient health care facility located in Sonoma, California. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

5.      Plaintiff, ST ROSE HOSPITAL (MPN 05-0002), is an inpatient health care facility located in Hayward, California. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

6.      Plaintiff, GLENDORA OAKS BEHAVIORAL HEALTH HOSPITAL (MPN 05-0205), is an inpatient health care facility located in Glendora, California. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

7.      Plaintiff, POMONA VALLEY HOSPITAL MEDICAL CENTER (Medicare provider number 05-0231), is an inpatient health care facility located in Pomona, California. During  the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

8.      Plaintiff, METHODIST HOSPITAL OF SOUTHERN CA (MPN 05-0238), is an inpatient health care facility located in Arcadia, California. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

9.      Plaintiff,  LODI MEMORIAL HOSPITAL  (MPN 05-0336), is an inpatient health care facility located in Lodi, California. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

10.      Plaintiff, TORRANCE MEMORIAL MEDICAL CENTER (MPN 05-0351), is an inpatient health care facility located in Torrance, California. During the period at issue in this case

furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

11.     Plaintiff, MARIN GENERAL HOSPITAL (MPN 05-0360), is an inpatient health care facility located in Greenbrae, California. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

12.     Plaintiff, WEST ANAHEIM MEDICAL CENTER (MPN 05-0426), is an inpatient health care facility located in Anaheim, California. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

13.     Plaintiff, THE QUEEN'S MEDICAL CENTER (MPN 12-0001), is an inpatient health care facility located in Honolulu, Hawaii. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

14.     Plaintiff, DEACONESS MEDICAL CENTER (MPN 50-0044), is an inpatient health care facility located in Spokane, Washington. During the period at issue in this case furnished inpatient and outpatient hospital services to, *inter alia*, patients entitled to benefits under both the Medicare programs and Medicaid.

15.     Each of the above-named Hospitals (hereinafter collectively referred to as, "Plaintiffs," "Hospitals," or "Plaintiff Hospitals) were at all relevant times general acute care hospitals that were eligible to participate in, and did in fact participate in the Medicare and Medicaid programs.

16.     Defendant Robert F. Kennedy, Jr is the Secretary of Health and Human Services ("HHS"), the federal department that contains the Centers for Medicare & Medicaid Services ("CMS"). CMS is the agency within HHS that is responsible for the administration of the Medicare program.

## GENERAL BACKGROUND OF THE MEDICARE PROGRAM

17.     The Medicare Program establishes a system of health insurance for the aged, disabled, and individuals afflicted with end-stage renal disease. Pursuant to 42 U.S.C. § 1395cc, the Hospitals entered into written agreements with Defendant to provide hospital services to eligible individuals.

18.     CMS implements the Medicare program, in part, through rulemaking. *See* 42 C.F.R. § 401.108. In addition to the substantive rules published by the Secretary in the Code of Federal Regulations and the Rulings, CMS publishes other interpretative rules implementing the Medicare program, which are compiled in CMS manuals. The Secretary also issues other subregulatory documents relating to the Medicare program, which generally do not have the force and effect of law.

## THE MEDICARE HOSPITAL INPATIENT PROSPECTIVE PAYMENT SYSTEM

19.     Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted the Hospital Inpatient Prospective Payment System ("IPPS") to reimburse hospitals, including Plaintiff Hospitals, for inpatient hospital operating costs. *See* 42 U.S.C. § 1395ww(d). Under IPPS, Medicare payments for hospital operating costs are not based directly on the costs actually incurred by the hospitals. Rather, they are based on predetermined, nationally applicable rates based on the diagnosis of the patient determined at the time of discharge from the inpatient stay, subject to certain payment adjustments. *See id.* One of these adjustments is the Medicare "disproportionate share hospital" or "DSH" payment. *See* 42 U.S.C. § 1395ww(d)(5)(F).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

20.     Payment to providers of services is commonly conducted by Medicare contractors known as Medicare Administrative Contractors ("MACs"), which function as agents of the Secretary pursuant to contracts with her. One MAC is assigned to each hospital that participates in Medicare. MACs make periodic interim payments to providers that are subject to subsequent adjustments for overpayments or underpayments. 42 U.S.C. § 1395h. At the time of the hospital stays giving rise to the bad debts at issue, the relevant Medicare contractors were known as fiscal intermediaries.

21.     At the close of its fiscal year, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. Under the Medicare program, each hospital's MAC is required to analyze and audit the hospital's annually submitted Medicare cost report and issue a Medicare Notice of Amount of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's fiscal year. 42 C.F.R. §405.1803.

22.     The Medicare Statute provides that if a hospital is dissatisfied with its MAC's final determination The Medicare Statute provides that if a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in the NPR, and the hospital satisfies the amount in controversy requirements, the hospital has a right to obtain a hearing before the PRRB by filing an appeal within 180 days of receiving its NPR (or any revised NPR). 42 U.S.C. §1395oo. In addition, the statute allows a hospital that is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of 42 U.S.C. § 1395ww to obtain a

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

PRRB hearing by requesting the hearing within 180 days after notice of the Secretary's final determination. 42 U.S.C. §1395oo(a)(1)(A)(ii), (a)(3).

23.    The regulations interpret the statutory requirements by stating that "the date of receipt by the Board of the provider's hearing request must be no later than 180 days after the date of receipt by the provider of the final contractor or Secretary determination." 42 C.F.R. §405.1835(a)(3).

24.    In addition to having the authority to make substantive decisions concerning Medicare reimbursement appeals, the PRRB is authorized to decide questions relating to its jurisdiction and procedure.

25.    The decision of the PRRB on substantive or jurisdictional issues constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the PRRB's decision. 42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§405.1875 and 405.1877. The Secretary has delegated his authority under the statute to review PRRB decisions to the CMS Administrator. Thus, the Secretary's final administrative decision for purposes of judicial review is either the decision of the PRRB or the decision of the CMS Administrator after review of the PRRB's decision.

26.    The Secretary is the proper defendant in such an action. See 42 C.F.R. § 405.1877(a)(2). Under 42 U.S.C. § 1395oo(f)(2), interest is to be awarded in favor of the prevailing party in an action brought under 42 U.S.C. § 1395oo(f). Under 42 U.S.C. § 1395g(d), CMS is required to pay interest on underpayments to Medicare Provider, if the underpayment is not paid within thirty days of a "final determination."

27.    Jurisdiction is also available under 28 U.S.C. § 1331 where the agency renders a final determination and there is no administrative appeal available for that determination. *Am.*

*Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005).

## MEDICARE BAD DEBT REIMBURSEMENT

28.     The Medicare statute prohibits cost-shifting, which means that costs associated with services provided to Medicare beneficiaries cannot be borne by non-Medicare patients, and vice versa. 42 U.S.C. § 1395x(v)(1)(A)(i).

29.     When a provider is unable to collect coinsurance or deductible payments from a Medicare beneficiary, it can claim those amounts as "bad debts" and receive reimbursement from Medicare, provided that certain conditions are met.

30.     Uncollected Medicare deductibles and coinsurance amounts are collectively referred to as "Medicare bad debt."  *See, e.g.*, *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 720 (D.C. Cir. 2009); 42 C.F.R. § 413.89(a). Medicare "reimburses providers for this 'bad debt'" in order to prevent cross-subsidization, *i.e.*, "a cost shift from the Medicare recipient to individuals not covered by Medicare." *See* 42 C.F.R. § 413.89(d); *Abington Crest*, 575 F.3d at 720.

31.     Medicare regulations declare that amounts due to providers from other parties for which providers are unable to recover are generally not reimbursable under the Medicare program because these bad debts are deemed "…deductions from revenue and are not to be included in allowable cost." 42 C.F.R. § 413.89(a). The Secretary will nonetheless reimburse a provider for certain bad debts attributable to deductible and coinsurance amounts related to covered services received from beneficiaries. 42 C.F.R. § 412.115(a). Such reimbursable bad debts are defined at 42 C.F.R. § 413.89(b):

> Bad debts are amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future.

32.     Under the regulations that the Secretary has developed, the amounts a hospital is unable to collect from a Medicare patient for unpaid deductible and coinsurance amounts ("bad debts") are treated as reductions in the hospital's revenue and not "reasonable costs" the hospital incurs because they are not actual "costs" in the delivery of care. *See Shalala v. St. Paul-Ramsey Medical Ctr.*, 50 F.3d 522, 524 (8th Cir. Minn. 1995).

33.     CMS has stated that "…the regulation at 42 C.F.R. § 413.89(a) specifically provides that bad debts are reductions in revenues and are not included in allowable costs." *See St. John Health 2004-2005 Bad Debt Moratorium CIRP Group v. Blue Cross Blue Shield Association*,  CMS Administrator Decision, No. 2014-D19 (Oct 23, 2014*), reprinted in* CCH Medicare & Medicaid Guide, ¶ 82,951.

34.     Under the governing regulations, providers seeking reimbursement for Medicare bad debt must demonstrate that the debt satisfies four criteria:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must be able to establish that reasonable collection efforts were made.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time  in the future.

42 C.F.R. § 413.89(e). *See also* Provider Reimbursement Manual ("PRM") § 308 (reiterating these four criteria).

35.     Because Medicaid patients are presumptively indigent under the Secretary's bad debt policy, hospitals are prohibited from trying to collect Medicare copayments from dually eligible patients (i.e., patients entitled to Medicare and eligible for Medicaid). Instead, they may seek only the copayments from the appropriate Medicaid State agency.

36. Title XIX of the Social Security Act, commonly known as the Medicaid statute, establishes a cooperative federal-state program that finances medical care for the poor, regardless of age. *See* 42 U.S.C. §§ 1396-1396v. States that choose to participate in the Medicaid program must submit plans to CMS for approval that detail financial eligibility criteria, covered medical services, and reimbursement methods and standards. 42 U.S.C. §§ 1396a(a), 1396b. These plans are known as State Plans. Once a State Plan is approved, the State will receive financial assistance from the federal government to administer its Medicaid program according to a percentage formula tied to the State's per-capita income. 42 U.S.C. §§ 1396b, 1396d(b). In some cases, individuals qualify for both Medicare and Medicaid. These individuals, commonly known as "dual-eligibles," may be unable to afford the costs of Medicare deductible or coinsurance payments. As a result, the Medicaid statute allows States to use Medicaid funds to pay the cost-sharing obligations of dual-eligibles, enabling States to shift a large portion, though not all, of the cost of providing health insurance for their elderly poor to the federal treasury. *See* 42 U.S.C. §§ 1396a(a)(10)(E)(i).

37. Before 1997, unless there was a specific exception in the approved State Plan, Medicaid paid the full amount of Medicare copayments.

38. The Balanced Budget Act (BBA) of 1997 authorized State Medicaid programs to refuse to pay any portion of Medicare copayments without a State Plan exception if the payment under the Medicare program for the service would exceed the payment amount Medicaid would have paid under the State Plan for such service if provided to an eligible recipient other than a Medicare beneficiary. BBA, Pub. L. No. 105-33, § 4714. Under this circumstance, Medicare is responsible for these copayments as Medicare "bad debts" in order to avoid unlawful cost-shifting.

39. A payment rate "ceiling" is "a limitation of Medicaid payment for a service" that for a particular claim removes the obligation of the State to pay anything further for deductibles or

coinsurance on a particular claim. A payment rate "ceiling" is described in PRM – I § 322. PRM – I § 322 states that "[i]n some instances, the State has an obligation to pay, but either does not pay anything or pays only part of the deductible or coinsurance because of a State payment 'ceiling.'" When the State asserts a Medicaid payment rate "ceiling," it has no legal obligation to pay any remaining unpaid coinsurance on the particular claim. Without a ceiling, only the State has the obligation to pay coinsurance.

## THE CALIFORNIA MEDICAID REIMBURSEMENT SYSTEM

40.    California's Medicaid program is known as "Medi-Cal." *See* California Welfare & Institutions Code § 14000.4. The State of California operates the Medi-Cal program pursuant to a State Plan approved by CMS under Title XIX of the Social Security Act.

41.    During the time period pertinent to this case, Plaintiff Hospitals all participated in the Medi-Cal program as providers of hospital services.

42.    Because State Medicaid programs are payers of last resort for health care services, the Medicare program is the primary payer for patients eligible for both Medicare and Medi-Cal benefits.

43.    For California hospitals, prior to January 1990 for outpatients and May 1994 for inpatients, Medi-Cal generally paid 100% of the Medicare coinsurance and deductibles for Medicare covered services furnished to hospital patients who were eligible for both Medicare and Medicaid.

44.    In the case of inpatient hospital services, claims submitted by hospitals to their Medicare fiscal intermediary automatically "crossed over" to Medi-Cal for payment of the Medicare coinsurance and deductible amounts for "dual eligible" patient payment. The fiscal intermediary transmitted the Medicare claim information to Medi-Cal pursuant to

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

coordination of benefit agreements. Hospitals did not need to submit separate claims to Medi-Cal in order for the coinsurance and deductible amounts to be paid.

45.    Effective May 1, 1994, Medi-Cal discontinued inpatient payment for Medicare coinsurance and deductibles for dual eligibles. *See* Exhibit P-10, p.001.[1] Medi-Cal decided unilaterally to limit the Medicaid payment for Medicare coinsurance and deductibles for crossover patients to an amount that, when combined with the Medicare payment, would not exceed the Medi-Cal payment rate for the services in question. Under this policy, Medi-Cal would pay no more than the Medi-Cal payment rate minus the amount paid by Medicare. In implementing this policy, Medi-Cal assumed that the Medicare payment for inpatient hospital services equaled or exceeded the Medi-Cal payment rate and did not perform claim-by-claim comparisons of the actual Medicare payment and the Medi-Cal payment rate. Medi-Cal implemented this policy before obtaining approval of an amendment to its State Plan from CMS. As a result, hospitals received no payment from Medi-Cal for the Medicare coinsurance and deductibles of crossover patients. Although the Medicare deductibles and coinsurance remained unpaid under this policy, and although Medi-Cal continued to refuse payment of these amounts, the fiscal intermediaries and CMS refused to allow any Medicare reimbursement for the unpaid Medicare coinsurance and deductible amounts as Medicare bad debts because the State's Plan for an inpatient claim ceiling had not been approved.

46.    On February 28, 1996, CMS formally approved State Plan Amendment 94-008 retroactive to May 1, 1994, which allowed Medi-Cal to restrict inpatient payment for Medicare coinsurance and deductibles such that Medi-Cal would only pay if and to the extent the Medicaid payment rate exceeded the Medicare primary payment (*i.e.,* Medicaid pays more

---

[1] The "Exhibit P-_" references throughout this Complaint are to the proceedings before the PRRB in this matter.  These exhibits are part of the Administrative Record in this case.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

than Medicare for the given service).  However, CMS continued to refuse any bad debt reimbursement for unpaid inpatient Medicare coinsurance and deductibles of dual eligible patients because the State failed to make a proper claim-by-claim comparison of the amount paid by Medicare with the Medi-Cal payment rate. Hospitals litigated Medi-Cal's failure to make claim by claim processing that led to non-payment by Medi-Cal and bad debt disallowance by Medicare.

47.     In a decision dated December 2, 1997, the U.S. Court of Appeals for the Ninth Circuit overturned a previous decision requiring Medi-Cal payment and held in favor of Medi-Cal's 1994 payment limit on claims for dual eligible patients, in light of the BBA of 1997 that "clarified" that such limits were permissible. *Beverly Community Hospital Association v. Employers Health Insurance*, 132 F.3d 1259 (9th Cir. 1997).

48.     The Secretary ultimately reached an agreement with the State of California, through which the State agreed to have EDS, its sole claims processing fiscal intermediary, reprocess the previously unprocessed claims (outside the normal billing process) covering the  period from May 1, 1994 through April 4, 1999. Once EDS completed this reprocessing, it furnished alternate documentation in the form of reports to the intermediaries that showed the claim comparison of amounts paid by Medicare and the Medicaid payment rate for the Medicare coinsurance and deductible amounts. Based on these reports, the unpaid coinsurance and deductible amounts were allowable as "bad debt," and the fiscal intermediaries were instructed to accept this alternate documentation and issue payments to providers for these amounts retroactive to May 1, 1994.

49.     Medicare cost reporting instructions at the time permitted providers to furnish alternative documentation of Medicaid eligibility and the amounts not payable by Medicaid

instead of Medicaid remittance advices or other proof of having billed the state Medicaid program. Provider Reimbursement Manual (PRM), Part II, § 1102.3L.

## MEDICAID ELIGIBILITY DETERMINATIONS

50.    Some hospital patients may be eligible for Medicaid at the time of their inpatient stay or outpatient visit, but due to a retrospective Medicaid eligibility determination (one made subsequent to the stay or visit but effective for the date(s) of the stay or visit), neither the hospital nor such patients will know, at the time or the stay or visit, that such patients are eligible for Medicaid.

51.    Retrospective Medicaid eligibility determinations may happen for several reasons. For example, an individual may apply for Medicaid but may not receive a favorable eligibility determination (which may be effective to the date of application) until weeks or months after the date of application. Also, an individual may have had his or her Medicaid eligibility terminated or suspended due to a redetermination of the individual's income and resources, but such suspension or termination may be later reversed and the individual's Medicaid eligibility reinstated retroactively (i.e., effective prior to the date of the reversal). Also, in certain States, including California, a person who is eligible for Supplemental Security Income (SSI) under title XVI of the Social Security Act is automatically eligible for Medicaid. In such a State, an individual who applies for SSI but who is initially denied eligibility may appeal the denial and may not be finally adjudged eligible, retroactive to the date of application, for SSI (and thus eligible for Medicaid) until months or years following the initial denial.

52.    In other cases, a hospital patient may be eligible for Medicaid based on a determination made prior to the patient entering the hospital, but the patient but may not know that he or she is eligible for Medicaid, or may not divulge that he or she is eligible despite being asked by hospital staff, or may give the hospital incorrect information (such as an incorrect Social

Security number or date of birth) thus preventing the hospital or intermediary from verifying with the State that the individual is eligible for Medicaid.

53.    For the reasons stated in the preceding two paragraphs, a hospital may not know or likely will not know, at the time it files its Medicare cost report for any given cost reporting period, who all of its Medicaid inpatients and outpatients were during such period.

## THE AUTOMATED CROSSOVER PROCESSES AND MEDI-CAL COULD NOT RELIABLY PRODUCE INPATIENT OR OUTPATIENT REMITTANCE ADVICES REQUIRED BY THE SECRETARY'S POLICY.

54.    CMS and Medi-Cal use an automated system whereby Medicare inpatient hospital claims (Part A) submitted to Medicare fiscal intermediaries by hospitals on behalf of "dual eligibles" (individuals who were entitled to Medicare and eligible for Medicaid) were automatically "crossed over" to the State of California for the State to determine its share, if any, of the Medicare co-insurance and deductibles.

55.    Testimony at the hearing before the PRRB in this case was that not all inpatient claims in fact crossed over. Specifically, only 80 – 90 percent of the inpatient claims crossed over. Transcript (August 23, 2012) 138. Testimony of Ms. Esther Mendez (Government Coordinator for Dignity Health's San Mateo central billing office). Testimony at the hearing was that firms specializing in billing crossover bad debt for hospital clients, and being paid only on crossover claims for which payment was made by Medi-Cal, were unable to obtain remittance advices for all crossover claims, but on average could only obtain Medi-Cal remittance advices for less than 90% of the dual eligible beneficiaries. Transcript (August 24, 2012) 127, testimony of Mr. Allen Carlson.

56.    There was no automated crossover of Medicare outpatient (Part B) claims until October 24, 2005, almost one year past the latest of the fiscal years in dispute (October 1995 through November 2004).

57.    Even after automated crossover of outpatient (Part B) claims from Medicare to Medi-Cal began, there remained a number of situations where manual billing was still necessary, as well as a number of instances where Medi-Cal could not reliably supply providers with outpatient "zero pay" remittance advices, such as in "zero pay" claims. Transcript (August 23, 2012) 137-146, testimony of Ms. Esther Mendez.

58.    A "zero pay" claim was one in which Medi-Cal had no liability because the maximum amount Medi-Cal would pay for the services covered by the claim was at or below the amount Medicare had paid, and thus Medi-Cal would pay nothing for the co-pays owed by the dual eligible patient.

59.    Esther Mendez further testified that if a Part B claim was submitted to a Medicare Part B contractor and payment was made by Medicare, the claim *might* automatically crossover to Medi-Cal, but that if the claim did not appear on the Medi-Cal RAD [Remittance Advice Document] within three weeks from the Medicare Remittance Notice (MRN) date, the reason for it not appearing on the Medi-Cal RAD could be because it was a "zero pay" claim.

60.    With respect to zero pay claims, in order for the hospital to have the claim appear on the RAD, the provider had to rebill Medi-Cal on paper or electronically (rather than being able to rely on the claim crossing over). Providers also had to rebill on paper or electronically if the claim that was supposed to have crossed over could not be located.

61.    Providers were also unable to obtain remittance advices from Medi-Cal in retroactive eligibility situations (where the patient was determined to be eligible for Medicaid for

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

the hospital encounter, but the determination was not made until sometime after the patient left the hospital. If the patient did not appear as Medicaid eligible at the time that the fiscal intermediary began the automated crossover process, the claim would not be crossed over.

## THE BAD DEBT MORATORIUM, THE MUST BILL POLICY, AND SECTION 1102.3L OF THE PRM, PART II

62.    In 1987, 1988, and 1989, Congress passed a total of three amendments in response to heightened scrutiny by intermediaries and the Health Care Financing Administration (renamed CMS) of Medicare bad debt reimbursement requests. *Hennepin County Med. Ctr. v. Shalala*, 81 F.3d 743 (8th Cir, 1995). The three amendments are collectively known as the Bad Debt Moratorium. First, in 1987, Congress enacted legislation to prohibit the Secretary from imposing more restrictive documentation requirements on providers for purposes of  Medicare bad debt reimbursement,  as part of the Omnibus Budget Reconciliation Act of 1987 (OBRA '87), Pub. L. No. 100-203, 101 Stat. 1330. Section 4008 of OBRA '87 provided:

> (c) CONTINUATION OF BAD DEBT RECOGNITION FOR HOSPITAL SERVICES. -- In making payments to hospitals under title XVIII of the Social Security Act, the Secretary of Health and Human Services *shall not make any change in the policy in effect on August 1, 1987, with respect to payment under title XVIII of the Social Security Act to providers of service* for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under such title (*including criteria for what constitutes a reasonable collection effort*).

101 Stat. 1330-55 (emphasis added).

63.    Thereafter, the Secretary's Inspector General continued to press for closer scrutiny of bad debt reimbursement requests. *Hennepin County Med. Ctr*., 81 F.3d at 747. In fact, in the fiscal year following the Bad Debt Moratorium, fiscal intermediaries disallowed 40 percent of the bad debt claims. In response, Congress amended the Bad Debt Moratorium in 1988. *Foothill Hosp. v. Leavitt*, 558 F. Supp. 2d 1, 3 (D.D.C. 2008). Specifically, in section 802 of the Technical and

Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, 102 Stat. 3342, Congress added the

following language to the Bad Debt Moratorium:

> MAINTENANCE OF BAD DEBT COLLECTION POLICY. Effective as of the date of the enactment of the Omnibus Budget Reconciliation Act "42 USC 1395f note" of 1987, section 4008(c) of such Act is amended by inserting after "reasonable collection effort" the following: ", *including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency*."

42 U.S.C. 1395f Note, emphasis added.

64.      In 1989, in section 6023 of OBRA '89 Congress amended the Moratorium a third

and final time by adding the following language:

> CLARIFICATION OF CONTINUATION OF AUGUST 1987 HOSPITAL BAD DEBT RECOGNITION POLICY. (a) IN GENERAL. -- Section 4008(c) of the Omnibus Budget Reconciliation Act of 1987 is amended by adding at the end the following: "The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy."

65.      In *Foothill Hospital v. Leavitt*, 558 F. Supp. 2d 1 (D.D.C. 2008), the court found

that the plain language of the 1987 amendment, quoted above, demonstrated that the Secretary is

prevented from changing its bad debt policies. As the *Foothill Hospital* court noted, the Secretary

admitted that "[t]he Act and its legislative history reflect a congressional intent to preclude the

Secretary from increasing provider requirements applicable to claims for reimbursement of

Medicare bad debt claims after that date." 558 F. Supp. 2d at 8.

66.      Moreover, prior to August 1, 1987 (when the Bad Debt Moratorium was instituted),

no PRRB decision or Administrator decision held in a "ceiling" case that the provider was required

to bill the State or receive a remittance advice from the State as a condition to claiming Medicare reimbursement as bad debts for co-pays owed by dual-eligibles.

67.    In considering whether providers must bill the State to constitute reasonable collection efforts to meet the criteria for Medicare payment of bad debt for dual eligibles, in *California Hospitals 90-91 Outpatient Crossover Bad Debts Group v. Blue Cross and Blue Shield Association/Blue Cross of California/Mutual of Omaha/Aetna Life Insurance Company (hereinafter "California Hospitals 90-91 Outpatient Crossover Bad Debts Group"), Admin. Dec. No. 2000 D-80*, the Administrator contrasted ceiling and non-ceiling cases, stating:

> Although the Providers cite CommuniCare, Admin. Dec. No. 97-D24, for support, the Administrator reversed that case finding that there was no evidence in the record that the State applied a ceiling to crossover payments. As the Administrator found no evidence of a ceiling, it was logical that the Administrator did not address the issue of whether a provider is required to bill the State when there was a ceiling and thus the Administrator was not required to specifically reverse the Board on that issue.

*California Hospitals 90-91 Outpatient Crossover Bad Debts Group, reported at* 2000 WL 33170706, at *9. In *Village Green Nursing Home v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Arizona*, HCFA Administrator Decision, *reprinted at* CCH ¶ 80,561 (August 3, 2000), the Administrator stated that:

> The Administrator recognizes that the Board contended that the circumstance at §322 of the PRM involving a payment ceiling is analogous to this circumstance where the State, despite its obligation, has not paid the claim. However, the Administrator finds that the instant case is not analogous to the circumstances of a payment ceiling. In the latter circumstance, the State has no obligation to pay for coinsurance and deductible amounts above the "ceiling."

68.    The "must bill policy" for ceiling cases was announced and applied for the first time in the 2000 CMS Administrator decision of *California Hospitals 90-91 Outpatient Crossover Bad Debts Group*. In *Grossmont Hospital Corporation v. Sebelius*, 903 F. Supp. 2d 39 (D.D.C. 2012), the Secretary described the must bill policy at issue in that case as "a must-bill policy that

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

relies upon the State to determine its cost-sharing responsibility" vis-à-vis Medicare's responsibility (Defs'. Reply Brief at 28). The CMS Administrator decision of *California Hospitals 90-91 Outpatient Crossover Bad Debts Group* was overturned on October 11, 2001 by the United States District Court for the Northern District of California relying upon the official policy interpretation of PRM II § 1102.3L.  The District Court was reversed on March 18, 2003  by the United States Court of Appeals for the Ninth Circuit on the basis that the official instructions in PRM II, § 1102.3L were published after the cost reporting periods under consideration.

69.     In litigation involving plaintiff Hospitals, the Court previously found that two pre-Moratorium Provider Reimbursement Review Board decisions could support a pre-Moratorium must-bill requirement, but that there was no evidence of a pre-Moratorium must get remittance advice requirement. Memo. Op., *Mercy Gen. Hosp. v. Azar*, No. 1:16-cv-99-RBW (D.D.C. Oct. 17, 2019), ECF No. 58 at 13-14.[2]

70.     Prior to the Bad Debts Moratorium, CMS's program instructions either did not specifically address or allowed providers to claim Medicare bad debts in ceiling cases without first billing the State. In 1995, CMS issued section 1102.3L of the PRM, Part II, which, in providing that providers were not required to bill Medicaid in certain situations, was limited *only* to ceiling situations. Section 1102.3L of the PRM, Part II states that:

> However, it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt <u>where the provider can establish that Medicaid is not responsible for payment</u>. In lieu of billing the Medicaid program, the provider must furnish documentation of:
>
> Medicaid eligibility at the time services were rendered (via valid Medicaid eligibility number), and

---

[2] Given this prior holding, Hospitals do not repeat their arguments herein that there was no must-bill policy predating the Moratorium and particularly not in ceiling cases; however, they reserve the right to so argue at a later date or in an appeal.

Nonpayment that would have occurred if the crossover claim had actually been filed with Medicaid.

Section 1102.3L of the PRM, Part II, *reprinted in* CCH Medicare & Medicaid Guide, 1996-1, ¶44,075, p. 10 (emphasis supplied). The underscored language, "where the provider can establish that Medicaid is not responsible for payment" refers to a ceiling type situation where Medicaid is not obligated to pay the entire cost-sharing amount because of a State Plan or State statute (because if Medicaid *were* obligated to pay the entire cost-sharing amount because of a State Plan or State statute, the provider would *not* be able to "establish that Medicaid is not responsible for payment").

71.    In recognition that both providers and the Secretary had access to the State's Medicaid rates and could determine what the State's payment obligation was on any claim, PRM – II § 1102.3L further provided that the calculation of the State's payment obligation under the "State payment ceiling" for any particular service was to "be audited based on the state's Medicaid plan in effect on the date that services were furnished."  See Tr. 152, August 24, testimony of Mr. Allen Carlson (computing what Medi-Cal would pay was a simple matter). Mr. Eric Yospe, who was responsible for all fiscal intermediary audit operations, as HCFA's Director of the Division of Provider Audit Operations was the primary drafter of section 1102.3L of the PRM, Part II.  It was Mr. Yospe's view in drafting section 1102.3L was that auditing the prescribed alternate documentation was feasible and a proper responsibility of the fiscal intermediary.

72.    In *Community Hospital of the Monterey Peninsula v. Thompson*, 323 F.3d 782, (9th Cir. 2003) (hereinafter "*Community Hospital*"), the Secretary argued that that the authorization in section 1102.3L of the PRM, Part II of an alternative to billing the State was irrelevant because it applied only when patients are "categorically denied payment under the State's Medicaid program."  323 F.3d at 798. In the course of rejecting the Secretary's attempt to limit the scope of section 1102.3L of the PRM, Part II, the Ninth Circuit stated that it agreed with the providers that

section 1102.3L provided that, in lieu of billing the Medicaid program, a provider could furnish documentation of Medicaid eligibility and the non-payment that would have occurred if the crossover claim had actually been filed with Medicaid. *Community Hospital,* 323 F.3d at 798. The court also stated that nothing suggests that the author of section 1102.3L understood it to be establishing a change in policy. 323 F.3d at 798. The court also stated:

> Indeed, as the Providers stress, there is strong reason to believe that the author had no intent to change existing policy. Effective in August of 1987, Congress imposed a moratorium on changes in bad-debt-reimbursement policies, and the Secretary lacked authority in November of 1995 to effect a change in policy.

*Id*. at 798, n.9.  The above-quoted language is the only place in its opinion where the court mentioned the Bad Debt Moratorium.

73.    Section 1102.3L of the Provider Reimbursement Manual, Part II, was issued following meetings of a workgroup that was composed of CMS (then called HCFA) representatives and provider representatives. The CMS officials responsible for section 1102.3L were aware of the Bad Debt Moratorium imposed by section 4008 of the Omnibus Budget Reconciliation Act of 1987 (OBRA '87), Pub. L. No. 100-203, 101 Stat. 1330, and would not have issued it had they believed that it was contrary to, or violative of, the Bad Debt Moratorium. Indeed, section 1102.3L references the Bad Debt Moratorium. See Exhibit P-34, p.012.   Upon information and belief, the Secretary's Office of General Counsel advised CMS that section 1102.3L was legally sufficient, prior to CMS's issuance of section 1102.3L of the PRM, Part II. The Secretary's Office of General Counsel did not advise CMS that section 1102.3L was contrary to, or violative of, the Bad Debt Moratorium.

74.    One purpose of section 1102.3L was to set forth documentation requirements by which providers could claim Medicare reimbursement for bad debts, including bad debts incurred

by dually eligible patients of California hospitals, without billing Medicaid. Form HCFA-339, the cost reporting questionnaire, for which the instructions appear at section 1102 of the PRM, Part II, was revised subsequent to a February 14, 1994 meeting of a workgroup consisting of HCFA officials and provider representatives. In a letter dated April 14, 1994, Eric Yospe, the Director of Provider Audit Operations at HCFA stated "the revisions/modifications recommended during our February 1994 meeting have been reviewed and, for the most part, incorporated in the enclosed revision. Therefore, we do not expect that there will be a need for any significant changes. We do not believe it will be necessary to reconvene the workgroup." *See* Exhibit P-29. The revised version of Form HCFA-339 was applicable to, and was in effect during all times relevant to, the bad debts at issue in this case.

75.    Section 1102.3L of the PRM, Part II (a copy of which appears at Exhibit P-34) contained instructions relating to Form HCFA-339 that were specific to bad debts. Section 1102.3L stated that a provider whose Medicare bad debts meet the substantive criteria for claiming bad debts specified therein "should complete Exhibit 5 [to Form HCFA-339] or submit internal schedules duplicating documentation requested on Exhibit 5 to support bad debts claimed." Apparently recognizing that the Bad Debt Moratorium allows voluntary or less restrictive or burdensome procedures, Section 1102.3L then references the Bad Debt Moratorium and states: "In accordance with OBRA 1987, intermediaries may not require hospitals to submit such a list that was not the intermediary's practice to require such data from the hospital as of August 1, 1987. However, voluntary submission of this exhibit would greatly assist the intermediary in verifying the allowability of the bad debts claimed. The submission of this listing may possibly provide the intermediary with sufficient information upon which to base its acceptance of the bad debts claimed on the hospital's cost report, without the necessity of an on-site visit."  Exhibit P-34, p.

012. Form HCFA-339 then states that the documentation for purposes of Exhibit 5 consists of the following: columns 1, 2, 3 – patient names, health insurance claim number, and dates of service; column 4 (applicable to those beneficiaries who are either indigent or medically indigent) – documentation requirements for those individuals for who the provider has deemed indigent due to Medicaid eligibility; columns 5 and 6 – the date that the first bill was sent to the beneficiary and the write-off date; column 7 – beneficiary payment as recorded on the Intermediary's remittance advice; columns 8 and 9 – the beneficiary's unpaid deductible and coinsurance amounts; and column 10 -- total Medicare bad debts as recorded on the cost report.  Exhibit P-34, pp.012-013. The Hospitals satisfied all of these documentation requirements for the bad debts at issue.

76.     In the California Hospitals 90-91 Outpatient Crossover Bad Debts Group decision, the CMS Administrator did not state that PRM – II § 1102.3L was new policy or a change in policy that was violative of the Bad Debt Moratorium. Instead, the CMS Administrator stated in that decision that "the Providers [sic] interpretation [of PRM – II § 1102.3L] would constitute a change in the instructions and thus as reflected in the Transmittal would only be effective for cost reporting period beginning on or after November 1995." 2000 WL 33170706 at *11, n.14.  The Secretary thus accepted the validity and applicability of PRM – II § 1102.3L for cost reports beginning on or after November 1995. There is no mention of the Bad Debt Moratorium in the California Hospitals 90-91 Outpatient Crossover Bad Debts Group decision of the CMS Administrator.

77.     Section 1102.3L of the PRM, Part II was in effect at all times relevant to the bad debts at issue in this case, which were incurred for cost reporting periods ending on or after 11/30/1995 and beginning before 1/1/2004.

**JOINT SIGNATURE MEMORANDUM (JSM) 370 AND HOLD HARMLESS RELIEF**

78.     By a Joint Signature Memorandum (JSM) dated August 10, 2004, the Secretary retracted section 1102.3L of the PRM, Part II. JSM 370 stated "[i]n November of 1995, language

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

was added in PRM-II Section 1102.3L (the cost report questionnaire) that allowed providers to show other documentation in lieu of billing the states. Unfortunately, that language conflicted with the billing requirements in Chapter 3 of the PRM-I, and the Ninth Circuit panel found Section 1102.3L to be inconsistent with the Secretary's must-bill policy (323 F.3d at 799)." The above-quoted statement from JSM 370 is incorrect that the language of section 1102.3L of the PRM, Part II conflicted with billing requirements in Chapter 3 of the PRM, Part I. The Secretary's must bill policy did not come into being, if at all, until 2000. The above-quoted statement from JSM 370 is also misleading because the Ninth Circuit in *Community Hospital* did not conclude that section 1102.3L was a change in policy, only that it was "inconsistent with the Secretary's must-bill policy." The Ninth Circuit noted, "[t]he only inconsistency to which the Providers can point is found in a manual provision that was not in existence during the relevant period, *i.e.*, the cost years concluding in 1989 through 1995." 323 F.3d at 798-99. The Ninth Circuit's point was that section 1102.3L of the PRM, Part II did not apply to the providers in *Community Hospital* case because it was not in effect during those cost reporting periods.

79.     In JSM-370 the Secretary also stated "[t]he [Ninth Circuit in *Community Hospital*] also noted that, effective in August of 1987, Congress had imposed a moratorium on changes in bad-debt reimbursement policies, and therefore the Secretary lacked authority in November of 1995 to effect a change in policy  (Id. at 798, note 9)." The above-quoted statement is incorrect. In footnote 9, the *Community Hospital* court said "[i]ndeed, as the providers stress, there is a strong reason to believe the author had no intent to change existing policy. Effective August 1987, Congress imposed a moratorium on changes in bad-debt-reimbursement policies, and the Secretary lacked authority in November 1995 to effect a change in policy."  323 F.3d at 798, n. 9. The *Community Hospital* court did not say or imply that section 1102.3L of the PRM, Part II violated

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

the Bad Debt Moratorium. The above-quoted language from footnote 9 is the only place in its opinion where the court mentioned the Bad Debt Moratorium. Nor did the Secretary argue in *Community Hospital* that section 1102.3L of the PRM, Part II was contrary to the Bad Debt Moratorium. Had the Secretary believed that section 1102.3L of the PRM, Part II was contrary to the Moratorium it would have so argued in an attempt to prevent the court from giving any consideration of it, particularly in light of the fact that the Secretary argued (unsuccessfully) that section 1102.3L of the PRM, Part II did not provide an alternative to billing the State in ceiling cases. Section 1102.3L of the PRM, Part II was not contrary to the Bad Debt Moratorium because the purpose of the Bad Debt Moratorium was to prevent the Secretary from changing his bad debt policies in such a way as to make it more difficult for providers to claim bad debts.

80.    JSM 370 included a hold-harmless provision which read as follows:

> **This memorandum is to serve as a directive to hold harmless providers that can demonstrate that they followed the instructions previously laid out at 1102.3L, for open cost reporting periods beginning prior to January 1, 2004**. Intermediaries who followed the now obsolete Section 1102.3L instructions for cost reporting periods prior to January 1, 2004 may reimburse providers they service for dual-eligible bad debts with respect to unsettled cost reports that were deemed allowable using other documentation in lieu of billing the state. Intermediaries that required the provider to file a State Remittance Advice for cost reporting periods prior to January 1, 2004, may NOT reopen providers' cost reports to accept alternative documentation for such cost reporting periods. **This "hold harmless" policy affects only those providers with cost reports that were open as of the date of issuance of this memorandum,** relating to cost reporting periods before January 1, 2004, and who relied on the previous language of section 1102.3L in providing documentation.

(emphasis in the original). By its terms, JSM 370 offers hold harmless relief to providers that relied on section 1102.3L of the PRM, Part II, and who have open cost reports for cost reporting periods beginning prior to January 1, 2004. Plaintiff Hospitals relied on section 1102.3L of the PRM, Part II, and the cost reporting periods at issue in this case all began prior to January 1, 2004. The

availability of hold harmless relief under JSM 370 to a provider that followed section 1102.3L of the PRM, Part II does not depend on a contractor having followed section 1102.3L after a provider had already relied upon it. It would be an unreasonable interpretation of JSM 370, and would deprive providers of fair notice, for the Secretary to interpret JSM 370 as requiring a contractor to have followed section 1102.3L of the PRM, Part II irrespective of whether a provider serviced by that contractor relied upon section 1102.3L.

## THE HOSPITALS RECEIVED THE EQUIVALENT OF REMITTANCE ADVICE FROM THE STATE

81.    The Hospitals' witness, Mr. Allen Carlson, testified at the hearing held before the PRRB that he first approached EDS, Medi-Cal's fiscal intermediary, in 1997 to inquire as to whether it would contract with Carlson, Price, Fass and Company, Inc. (later to become A. Carlson Associates, LLC) to provide its State certified data of the Medicaid eligibility of the unbilled patients and the amount Medi-Cal would not have paid on crossover bad debt claims.  *See* Exhibit P-92, pp.003-004, January 28, 1997 letter to State of California. Mr. Carlson testified that, after working together for several years for purposes of preparing the Medicaid eligibility and payments at issue in the Community Hospital case, he again approached EDS in 2004 for the purposes of acquiring the State certified data he would need for the Hospitals and cost years at issue in this appeal. Transcript (August 24, 2012) 141:3-141:15; *see also* Exhibit P-93, p. 001-004, August 27, 2004 letter to California.

82.    In order to contract with EDS, Mr. Carlson discussed the issue with the California Department of Health Services (DHS) and obtained DHS's approval for pursuing a contract with EDS. Transcript (August 24, 2012) 141:16-141:24; *see also* Exhibit P-94, October 25, 2004 letter to California Department of Health Services. EDS then requested and received formal approval from DHS to contract with Mr. Carlson. See Exhibit P-96, pp.006-007, August 14, 2007 letter

from EDS to California Department of Health Services. EDS then contracted with A. Carlson Associates, LLC to provide the documentation necessary for calculating Medicaid eligibility and bad debt amounts. Transcript (August 24, 2012) 141:25-142:15; *see also* Exhibit P-96, correspondence between A. Carlson Associates, LLC and California Department of Health Services, and signed agreement between EDS and California Department of Health Services.

83.    Ed Price, a healthcare financial data management engineer who was retained by A. Carlson Associates LLC to manage the crossover bad debt data at issue in this case, testified at the hearing held before the PRRB that the Medicare fiscal intermediaries provided Mr. Carlson with hospital data in the form of "paid Medicare claims data in the form of remittance advices and PS&R [(Provider Statistical & Reimbursement)] reports, [and] electronic PS&R reports," which represented data on "one-hundred percent of the population of Medicare claims associated with the periods in consideration." Transcript (August 23, 2012) 225:16-226:2. Mr. Price testified that he then used the hospital's actual bad debt logs and cross-referenced them with the hospital data so as to identify all of the crossover claims that had already been addressed. Those claims were then removed to ensure they did not get claimed again. Transcript (August 23, 2012) 226:3-226:17.

84.    Mr. Price testified that he then supplemented the remaining hospital data with additional patient information from the provider hospitals (i.e., gender, date of birth) in order to "make a complete claim" that could be submitted to the state. Transcript (August 23, 2012) 226:18-227:12.  Mr. Price further testified that the completed claims data was submitted to the state's "eligibility re-verification process" (Exhibit P-98) which "determine[s] Medi-Cal eligibility for the disproportionate share Medicare DSH process," Transcript (August 23, 2012) 227:22-228:8; *see also* Exhibit P-98, California Department of Health Services' Disproportionate Share Hospitals Eligibility Re-Verification Process User Manual.  This Eligibility Re-Verification System does not

contain eligibility information until thirteen months after the month of service and therefore cannot be used in order to bill Medi-Cal or provide documentation at the time of filing a Medicare cost report. Mr. Price testified that using an eligibility verification system that establishes eligibility on a retrospective basis, instead of a contemporaneous basis, is as accurate, "if not more accurate than looking at eligibility on the date of service." Transcript (August 23, 2012) 232:2-25. Furthermore, Mr. Price testified that no fiscal intermediary had refused to consider this retrospective eligibility data because it was not contemporaneous, stating that "this is the only source of eligibility acceptable to the fiscal intermediary in the state of California as far as documenting Medi-Cal eligibility." Transcript (August 23, 2012) 231:17-232:1.

85.    Mr. Price further testified that, once he established eligibility of crossover bad debt claims, he worked with EDS to "set up the process for determining the pricing and the evaluation of the cutback amount" for these claims. Transcript (August 23, 2012) 243:23-244:9. To that end, EDS and Mr. Price worked together to use the pricing rates and rules that were in effect at the time of service to create a series of reports that would show when the claim had hit the Medi-Cal ceiling and what Medi-Cal would not have paid on the claim. Transcript (August 23, 2012) 246:25-255:14; see also Exhibits P-110 – 113, reports.

86.    From the remittance advices or detailed PS&R reports, the Hospitals also identified the necessary detailed information relating to diagnosis, procedures, charges, Medicare payments and the Medicare coinsurance and deductibles for billing covered services furnished to the dual eligible patients. Following a similar methodology utilized by Medi-Cal and the Intermediary for the inpatient lump-sum payments made during 1999, as reflected in the Intermediary correspondence and Medi-Cal reports for the lump sum payments, the Hospitals submitted previously unprocessed crossover claims to Medi-Cal's fiscal intermediary for reprocessing using

processes and prices that were in effect at the time services were rendered.  It is the Medi-Cal

Program's fiscal intermediary, as authorized by the California Department of Health Services, who

determined and certified the difference between the Medicare primary payment and the Medi-Cal

payment rate for each inpatient claim. The certification appearing on each page of the Medi-Cal

Program's Intermediary's reports reads as follows:

> INFORMATION PROVIDED ON THIS REPORT IS DERIVED FROM
> CLAIMS DATA SUBMITTED BY A.CARLSON ASSOCIATES ON
> BEHALF OF ITS HOSPITAL CLIENTS AND PROCESSED
> (ELIGIBILITY VERIFIED AND MEDI-CAL PAYMENT/CUTBACK
> COMPUTED) ACCORDING TO MEDI-CAL PROCEDURES AND
> POLICIES USING PAYMENT RATES IN EFFECT AT THE TIME OF
> SERVICE.

If the Medi-Cal payment rate was equal or less than the Medicare payment, no portion of the

Medicare coinsurance and deductibles is payable by Medi-Cal. If the Medi-Cal payment rate

exceeded the Medicare payment, the amount exceeding the Medicare payment is the amount

payable by Medi-Cal for the Medicare coinsurance and deductibles, up to the total Medicare

coinsurance and deductibles. As with the lump sum payment methodology utilized by the

Intermediary, the remaining portions of Medicare and Medicaid deductibles not payable by Medi-

Cal constitute the Hospitals' reimbursable Medicare bad debt for crossover patients.

87.    Mr. Price testified that in order to eliminate the possibility that a beneficiary was

responsible for payment of some of the coinsurance and deductibles the Hospitals' lists exclude

all patients with a met or unmet Medicaid share of cost obligation. Transcript (August 23, 2012)

249: 19-250:5.  Additional, adjustments were made for outpatient claims with service dates after

1998 for therapy services that are not subject to co-insurance. Finally, the Hospitals' reimbursable

bad debt amounts were reduced by the amount of the Balanced Budget Act Bad Debt Reduction

factor for cost reporting periods beginning during the 1998 federal fiscal year or later.

88.    Bad Debt lists and all supporting documentation were presented to the PRRB and Intermediaries in electronic format to safeguard protected health information, to save printing voluminous exhibits, and to facilitate any review or audit process.

## NEW BAD DEBT REGULATIONS

89.    New bad debt regulations (published in September 2020) codify—and apply retroactively—that providers must bill the State notwithstanding that they also codify (and apply retroactively) that providers may submit alternative documentation in lieu of a remittance advice in order to evidence that the State has no obligation to pay the beneficiary's Medicare cost sharing. As to dually eligible beneficiaries, the regulations provide:

(iii)  Indigent dual-eligible beneficiaries (including qualified Medicare beneficiaries). Providers may deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid under a State's Title XIX Medicaid program as either categorically needy individuals or medically needy individuals. To be considered a reasonable collection effort for dual-eligible beneficiaries:

(A) When a State permits a Medicare provider's Medicaid enrollment for the purposes of processing a beneficiary's claim, to determine the State's liability for the beneficiary's Medicare cost sharing, the provider -

(1) Must determine whether the State's Title XIX Medicaid Program (or a local welfare agency, if applicable) is responsible to pay all or a portion of the beneficiary's Medicare deductible or coinsurance amounts;

(2) Must submit a bill to its Medicaid/Title XIX agency (or to its local welfare agency) to determine the State's cost sharing obligation to pay all or a portion of the applicable Medicare deductible and coinsurance;

(3) Must submit the Medicaid remittance advice received from the State to its Medicare contractor;

(4) Must reduce allowable Medicare bad debt by any amount that the State is obligated to pay, either by statute or under the terms of its approved Medicaid State plan, regardless of whether the State actually pays its obligated amount to the provider; and

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

(5) May include the Medicare deductible or coinsurance amount, or any portion thereof that the State is not obligated to pay, and which remains unpaid by the beneficiary, as an allowable Medicare bad debt.

(B) When, through no fault of the provider, a provider does not receive a Medicaid remittance advice because the State does not permit a Medicare provider's Medicaid enrollment for the purposes of processing a beneficiary's claim, or because the State does not generate a Medicaid remittance advice, the provider -

(1) Must submit to its contractor, all of the following auditable and verifiable documentation:

(i) The State's Medicaid notification stating that the State has no legal obligation to pay the provider for the beneficiary's Medicare cost sharing.

(ii) A calculation of the amount the State owes the provider for Medicare cost sharing.

(iii) Verification of the beneficiary's eligibility for Medicaid for the date of service;

(2) Must reduce allowable Medicare bad debt by any amount the State is obligated to pay, regardless of whether the State actually pays its obligated amount to the provider; and

(3) May include the Medicare deductible or coinsurance amount, or any portion thereof that the State is not obligated to pay, and which remains unpaid by the beneficiary, as an allowable Medicare bad debt.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e)(2).

90.     These regulations provide that providers must bill the State, and, with two exceptions, submit remittance advice. *Id.* Alternative documentation in lieu of remittance advice is acceptable: "When, through no fault of the provider, a provider does not receive a Medicaid remittance advice [(1)] because the State does not permit a Medicare provider's Medicaid enrollment for the purposes of processing a beneficiary's claim, or [(2)] because the State does not generate a Medicaid remittance advice." *Id.*

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

91.     Thus, before the PRRB, there arose an additional question about the impact of new retroactive bad debt regulations. The regulations have the force and effect of law and, by its terms, the PRRB must apply it to the cost years under Appeal.

92.     The new regulations are arbitrary and capricious, including because they retroactively require providers to bill the State despite PRM § 1102.3L which was in existence during the cost years at issue and notwithstanding that the new regulations recognize that providers can submit alternative documentation in lieu of a remittance advice.

93.     The requirement to bill the State serves no valid purpose. The only reason one would bill the State would be to obtain a remittance advice, and CMS has already conceded that alternative documentation can be submitted instead of a remittance advice. Moreover, alternative documentation is available, verifiable, and auditable in ceiling cases.

94.     Specifically, CMS has conceded that "documentation setting forth the State's liability for the Medicare cost sharing, or lack thereof, can be produced by the provider, in part, from the State Plan documents and may also include other documents such as state and state contractor fee schedules or payment rates, or other documents the provider produces that can be verified by the contractor," and that, "as previously detailed and noted by some commenters, documentation verifying the beneficiary's eligibility for Medicaid for the date of service could take the form of an eligibility report from a state's eligibility verification system."  Moreover, CMS represented that "Medicare contractors will afford providers flexibility in producing documentation acceptable to evidence the State's Medicare cost sharing in the absence of a Medicaid RA [and] . . . will afford providers flexibility in producing acceptable evidence of the beneficiary's eligibility for Medicaid for the date of service."  85 Fed. Reg. at 59,003.

95.    Moreover, the District Court has already determined that the requirement for a remittance advice did not exist prior to the Bad Debt Moratorium, and thus CMS's attempt to impose a remittance advice requirement retroactively, including for the cost years at issue in this case (which pre-date the 2012 repeal of the Moratorium), is ultra vires.

## THE PRRB & JUDICIAL REVIEW

96.    Section 1878(a) of the Social Security Act, 42 U.S.C. 1395oo(a), provides that, under certain circumstances, a provider of services may obtain a hearing before the Provider Reimbursement Review Board (PRRB) if it has timely filed a cost report and received a final determination from its fiscal intermediary or the Secretary with which it is dissatisfied or the amount in controversy is $10,000 or more, and the provider files a request for a hearing within 180 days after notice of such determination was received.

97.    The statute provides that a provider has the right to judicial review of any final decision of the PRRB, or of any reversal, affirmance, or modification by the Secretary (whose decisionmaking authority has been delegated to the CMS Administrator), by a civil action commenced within 60 days of the date on which notice of any final decision by the PRRB, or of any reversal, affirmance, or modification by the Secretary, is received.  42 U.S.C. § 1395oo(f). *See also* 42 C.F.R. § 405.1877.

98.    The PRRB's authority, however, is limited. By statute, certain matters, such as declaring a statute or promulgated rule or regulation invalid, arbitrary, and capricious, are outside of the PRRB's purview.  *See* 42 C.F.R. § 405.1867.  Where such matters arise, an aggrieved party may seek relief directly from the United States District Court by making a request to the Board for Expedited Judicial Review ("EJR"). *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

99.    Pursuant to section 1878(f)(1) of the Social Security Act, 42 U.S.C. § 1395oo(f)(1), a provider's request for EJR is "…*a request for a determination by the Board of its authority to*

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

***decide the question of law or regulations*** relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render ***such determination*** in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing." (emphases added). In other words, upon receiving a request for EJR, the Board must issue a determination as to its authority to decide the question of law or regulations and, if the Board does not do so within thirty days, the provider may bring a civil action.

100.    The Hospitals requested EJR on June 27, 2025 (attached hereto as **Exhibit A**), pointing out that the Board has jurisdiction over their appeal but lacks the authority to decide the legal question of their challenge to the 2021 IPPS Final Rule.

101.    The Board has jurisdiction over the Hospitals' appeal (PRRB Case Nos. listed in Exhibits A and B).

102.    The Board does not have the authority to decide whether the 2021 IPPS Final Rule is invalid or arbitrary and capricious.

103.    The Board issued its decision to the Hospitals' request for EJR in its correspondence dated July 8, 2025 (attached hereto as **Exhibit B**). In its narrative, the Board not only denies the Hospital's request for EJR (Ex. B at 8-9), but it also chose to dismiss each and every appeal, "…since the Board is unable to establish jurisdiction over these appeals." Ex. B at 9. It is the Hospitals' position that indeed the Board had jurisdiction over their appeals (*see,* Ex.

A). Moreover, the Board's letter of July 8, 2025 does *not* set forth a "determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy." *See* 42 U.S.C. § 1395oo(f). As such, the Board has not issued an EJR determination within the meaning of the statute, and the Board's 30-day period to issue such determination has expired. The Hospitals bring the instant action pursuant to these provisions.

104.    In the alternative, even if the "Denial of Request for [EJR]" were somehow considered a "determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy" pursuant to 42 U.S.C. § 1395oo(f), such denial was arbitrary and capricious.

105.    In relevant part, the regulations governing EJR provide at 42 C.F.R. § 405.1842(f)(1) that the Board must grant EJR for a legal question relevant to a specific matter at issue in a Board appeal if the Board determines: (i) the Board has jurisdiction on the matter at issue and (ii) the Board lacks the authority to decide a specific legal question relevant to the specific matter at issue because the legal question is a challenge . . . to the substantive or procedural validity of a regulation or CMS Ruling." § 405.1842(f)(1). The regulations provide at § 405.1842(f)(2) that the Board must deny EJR if (i) the Board determines it does not have jurisdiction; or (ii) if the Board determines it has the authority to decide a specific legal question; or (iii) if the Board determines it does not have sufficient information to determine whether it has jurisdiction or authority.   42 C.F.R. § 405.1842(f)(2). In this case, the Board did not make any of these determinations, or, if it did, did not reasonably make any of these determinations. As such, the denial of EJR (if that is what it was) was arbitrary and capricious.

106.    It is unclear whether the Board believes its determination meets the criteria of 42 C.F.R. § 405.1842(f)(2)(iii), but it plainly does not. The Board's "Denial" italicizes the language

of § 405.1842(f)(2)(iii) (providing that the Board must deny EJR if the Board "does not have sufficient information to determine whether the criteria specified in paragraph (f)(1)(i) or (f)(1)(iii) are met.")  Ex. B at 6. But the Board does not say that it is relying on (f)(2)(iii) nor does it identify what information it believes it lacks but needs to determine whether it has jurisdiction or authority.

107.    The Board asserts in its "Denial" that "the Board has not yet received the information needed to decide the factual and legal issues and complete the records as required by the District Court's remand," Ex. B at 6, but that is beside the point because it has nothing to do with a determination of the Board's jurisdiction or authority, nor additional information needed to make an assessment as to jurisdiction or authority.  The fact of the matter is that the Hospitals' claims at issue in this case are subject to the FY 2021 IPPS Final Rule which retroactively require providers to bill the State including ceiling cases, a requirement that the Hospitals assert is arbitrary and capricious. Because the Board has jurisdiction but not the authority over this challenge to regulation, the Board must grant EJR, and the Board's denial was arbitrary and capricious.

108.    The Board characterized the 2021 IPPS Final Rule as "an intervening event," Ex. B at 6, and that is absolutely correct. The 2021 IPPS Final Rule—which is to be given the force and effect of law unless and until it is invalidated—Intervened and disrupted this matter on remand because it retroactively imposes new and different requirements on the Hospitals' claims at issue in this case. Because the Board would be required to apply the 2021 IPPS Final Rule to the claims in this case, Hospitals' EJR Request challenging that Final Rule was complete and appropriate, and should have been granted.

109.    To be sure, no further factual development or comment is necessary to determine whether the FY 2021 IPPS Final Rule applies to the Hospitals' claims at issue. It is clear that the Final Rule retroactively requires the Hospitals to have billed the State in ceiling cases, and it is

undisputed that some or even most of the claims at issue in this case were not billed to the State. It is equally clear the Board does not have the authority to invalidate the FY 2021 IPPS Final Rule. As such, a grant of EJR is and was required.

110.    The Board's claim that the EJR Request itself is underdeveloped and conclusory is incorrect and irrelevant. *See* Ex. B at 6. The Hospitals' Request for EJR included, "Because the Board does not have the authority to decide the legal question, i.e., the validity of the FY 2021 IPPS Rule's requirement that a provider must bill the State even if it has documentation alternative to the remittance advice (*see* 42 CFR 405.1867), and because the Providers have not billed the State for all of the bad debts at issue in this case, the Providers believe they are entitled to EJR." Ex. A at 2. No additional "development" is needed for the Board to plainly see that it lacks authority to decide the legal question.

111.    To be sure, the 2021 IPPS Rule provides an exception to the requirement that a provider must obtain remittance advice, when, through no fault of the provider, a provider does not receive a Medicaid remittance advice because the State does not permit a Medicare provider's Medicaid enrollment for the purposes of processing a beneficiary's claim, or because the State does not generate a Medicaid remittance advice.   42 C.F.R. § 413.89(e)(2)(iii)(B). But that exception does *not* excuse providers from billing the State as the retroactive regulation requires and as the providers challenge in this case. Therefore, action on remand plainly will not obviate the need for EJR, as the Board claims may be a possibility. *See* Ex. B at 6.

## <u>COUNT I</u>

### Violation of the Administrative Procedure Act (must bill policy)

112.    Plaintiff Hospitals hereby incorporate by reference paragraphs 1- 111.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

113.    Under the APA, 5 U.S.C. § 706(2)(A), this Court is required to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

114.    The new regulations promulgated by the FY 2021 IPPS Final Rule are arbitrary and capricious because they retroactively require providers to bill the State in ceiling cases. The requirement to bill the State serves no valid purpose in ceiling cases, because as the Secretary concedes, providers are aware of published State payment policies and rates, and can determine Medicaid eligibility through State data matches.

115.    The agency has not provided a reasoned explanation for requiring providers to bill the State in ceiling cases.

116.    The must bill policy arbitrarily and capriciously forecloses provider right to payment on the arbitrary basis that the provider did not bill the State, despite that there are verifiable and auditable other means of showing the State would not pay in ceiling cases. Moreover, it is not always cost effective to bill the State, and providers with such claims should not be denied payment for valid bad debts.

## COUNT II

**Violation of the Administrative Procedure Act (must get remittance advice policy)**

117.    Plaintiff Hospitals hereby incorporate by reference paragraphs 1-116.

118.    The new regulations promulgated by the FY 2021 IPPS Final Rule are arbitrary and capricious because they require providers to submit remittance advice for ceiling cases in almost all circumstances despite that alternative documentation, using State records, can accomplish the same purpose as a remittance advice, and is auditable and verifiable, and therefore should be permitted in ceiling cases.

119.    The agency has not provided a reasoned explanation for requiring providers to obtain a remittance advice from the State in ceiling cases.

## COUNT III

### Violation of the Administrative Procedure Act (alternative documentation should be permissible)

120.    Plaintiff Hospitals hereby incorporate by reference paragraphs 1-119.

121.    The new regulations promulgated by the FY 2021 IPPS Final Rule as applied to Plaintiffs' ceiling claims are arbitrary and capricious because Plaintiffs effectively billed the State and received a remittance advice through the processing of their claims by the State's fiscal intermediary EDS.

122.    The new regulations promulgated by the FY 2021 IPPS Final Rule as applied to Plaintiffs' ceiling claims are arbitrary and capricious because Plaintiffs followed the alternative documentation requirements contained in section 1102.3L of the Provider Reimbursement Manual and also obtained surrogate remittance advices from EDS, which, as the State's Medicaid fiscal intermediary, used the same official State information and the same process as it did when producing official remittance advices for the State.

123.    The FY 2021 IPPS Final Rule arbitrarily and capriciously retroactively forecloses the appropriate avenues Plaintiffs took in ceiling cases to obtain reimbursement.

## COUNT IV

### Violation of the Social Security Act (retroactivity)

124.    Plaintiff Hospitals hereby incorporate by reference paragraphs 1-123.

125.    Section 1871(e)(1)(A) of the Social Security Act, 42 U.S.C. § 1395hh(e)(1)(A) generally prohibits the Secretary from giving retroactive effect to rules, and instead allows the

Secretary to give retroactive effect only when retroactivity is required by statute or is in the public interest.

126.    The regulatory requirements that providers must bill the State in ceiling cases before claiming the debt to Medicare, and that they must in almost all circumstances obtain a remittance advice, for all cost years, including the cost years at issue in this case, are neither required by statute nor in the public interest.

## COUNT V

### Ultra Vires Rulemaking

127.    Plaintiff Hospitals hereby incorporate by reference paragraphs 1-126.

128.    The retroactive regulatory requirement that providers must bill the State before claiming the debt to Medicare, and that they must in almost all circumstances obtain a remittance advice, for all cost years, including the cost years at issue in this case, is in conflict with the Bad Debt Moratorium, as previously held by the District Court in this case.

129.    The Secretary has no authority to issue regulations that are in conflict with an Act of Congress, and therefore the regulatory requirements to bill the State and to obtain a remittance advice for periods for which the Bad Debt Moratorium was in effect is null and void.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

## COUNT VI

### Violation of the Court's Order

130.    Plaintiff Hospitals hereby incorporate by reference paragraphs 1-129.

131.    By conducting proceedings that are inconsistent with the District Court's October 17, 2019 remand order, the Secretary through the PRRB is causing undue delay and needless expense to the Hospitals and depriving them of due process and the benefit of the District Court's decision.

## COUNT VII (in the alternative)

### Violation of the Administrative Procedure Act (EJR determination)

132.    Plaintiff Hospitals hereby incorporate by reference paragraphs 1-131.

133.    Under the APA, 5 U.S.C. § 706(2)(A), this Court is required to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

134.    If the Board's EJR determination is considered a determination on EJR within the meaning of 42 U.S.C. § 1395oo(f)(1), it must be set aside as arbitrary and capricious.

## RELIEF REQUESTED

For the reasons stated above, Plaintiff Hospitals request that the Court enter an order:

a.    Setting aside the 2021 IPPS Final Rule to the extent it requires providers to bill the State in ceiling cases and to the extent it requires providers obtain remittance advice in ceiling cases; or, in the alternative, at least to the extent those requirements are retroactive;

b.    Awarding the Hospitals the reimbursement claimed, or in the alternative, remanding this action to the Secretary solely for the purpose of calculating the amount of reimbursement due;

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

c.      Awarding the Hospitals interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

d.      Awarding the costs of suit incurred by the Hospitals; and

e.      In the alternative, should the Court not accept jurisdiction under 42 U.S.C. § 1395oo(f), it should accept jurisdiction under 28 U.S.C. § 1361 and enjoin the Secretary from conducting any proceedings that are inconsistent with the District Court's October 17, 2017 Memorandum Opinion and Order and order the Secretary to complete remand proceedings within six (6) months of the Court's order; and

f.      Should the Court find it necessary, remand the EJR determination to the Board with instructions to grant EJR; and

g.      Providing such other relief as the Court deems proper.

Dated: September 5, 2025                         Respectfully submitted,

                                                ALAN J. SEDLEY LAW CORPORATION


                                                By: */s/ Alan J. Sedley*
                                                Alan J. Sedley, Esq. Bar# OH0017
                                                18880 Douglas, Suite 417 Irvine, CA 92612
                                                Phone:818.601.0098
                                                asedley@sedleyhealthlaw.com

                                                *Attorneys for Plaintiffs*

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT